IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MEDRAD, INC., a Delaware corporation, | ) |
| | ) |
| Plaintiff/Counterdefendant, | ) |
| | ) No. 08 CV 5088 |
| v. | ) |
| | ) Judge Joan H. Lefkow |
| SPRITE DEVELOPMENT, LLC, SPRITE | ) |
| SOLUTIONS, LLC, HANS MISCHE, LLC, | ) |
| ROBERT BECK, LLC, Minnesota | ) |
| corporations, HANS MISCHE, individually, | ) |
| and ROBERT BECK, individually, | ) |
| | ) |
| Defendants/Counterclaimants. | ) |

## OPINION AND ORDER

Medrad, Inc. ("Medrad") brought suit against Sprite Development, LLC ("Development"); Sprite Solutions, LLC ("Solutions");[1] Hans Mische, LLC; Robert Beck, LLC; and Hans Mische and Robert Beck. Development, Hans Mische, LLC, and Robert Beck, LLC (collectively, "counterclaimants") filed a counterclaim against Medrad for fraudulent inducement, violation of the Sherman Act, 15 U.S.C. §§ 1–2, conversion, and breach of contract. Before the court is Medrad's motion to dismiss the counterclaims. For the following reasons, the motion [#66] is granted.

## BACKGROUND[2]

---

[1] The court dismissed Solutions in its September 8, 2010 Opinion and Order based on the parties' agreement that Solutions was never a valid Minnesota limited liability company. *See* Dkt. No. 61 at 7.

[2] The facts recounted in this section are taken from the counterclaim and are presumed true for the purpose of resolving the pending motion. Where the allegations of the counterclaim conflict with the

Development is in the business of creating and developing technological concepts in the cardiovascular medical industry. It owns various patents relating to cardiovascular medical technology, including a method, devices, and systems that deal with the mechanical removal of occlusive material from the body using catheters and catheter systems. Medrad develops and sells medical devices. While its focus was on medical imaging, it also has expanded into the market for mechanical thrombectomy (i.e., the removal of clots). Development's thrombectomy technology was designed to use an injector system like that developed by Medrad.

In August 2004, Medrad and Development began negotiating a contract for Medrad to develop medical procedures and technology based on Development's intellectual property. The products Medrad sought to develop based on Development's patents were directly competitive with those of Possis, another company that designed, manufactured, marketed, and sold thrombectomy catheter and injector systems. Medrad represented that it had the experience, resources, and capabilities to develop the products at issue. After months of negotiations, a Joint Development Agreement ("development agreement") was entered into on July 26, 2005 between Solutions and Medrad in which Solutions agreed to license its patents to Medrad in exchange for certain payments as set out in the agreement.[3] Beck and Mische signed the development agreement on Solutions's behalf.[4] In the development agreement, Medrad agreed to do the

---

Joint Development Agreement, attached to Medrad's complaint and central to the counterclaim, the Joint Development Agreement prevails. *See N. Indiana Gun & Outdoor Shows, Inc.* v. *City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998) ("[W]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

[3] Although the counterclaim refers to Development as the party that entered into the development agreement, the development agreement clearly indicates that Solutions, not Development, was the party to the agreement.

[4] In its September 8, 2010 Opinion and Order, ruling on defendants' motion to dismiss for lack of jurisdiction and improper venue, the court concluded that Beck and Mische could be held individually liable on the contract.

following: (1) cooperate with Solutions in the development of thrombectomy and related products using Solutions's technology, (2) establish a plan for developing these products, (3) design and develop these products according to the plan, (4) pay such expenses as were reasonably necessary to design and develop these products, (5) perform and pay for reasonably necessary clinical trials, (6) take responsibility and pay for obtaining regulatory approvals for the products, and (7) consider Solutions's input and requests in the development process and work cooperatively with Solutions to resolve concerns. Medrad also entered into consulting agreements with Hans Mische, LLC and Robert Beck, LLC for services Beck and Mische were to provide Medrad in connection with the development agreement.

Despite its representations, Medrad did not use commercially reasonable efforts to develop and commercialize the products covered by the development agreement. Specifically, Medrad did not fund a development budget for the products until 2008 and, when it did so, the budget was intentionally inadequate. Medrad also failed to implement an appropriate development plan and involve Solutions (or, for that matter, Development) in any development activities. Medrad also only acknowledged meeting one milestone under the development agreement, even though its internal documentation indicates that additional milestones were met. Instead of fulfilling its duties under the development agreement, Medrad was seeking to acquire Prossis, Development's direct competitor. This pursuit began in fall 2005, not long after Medrad finalized the development agreement with Solutions. Medrad used the development agreement as a bargaining chip in its pursuit of Prossis, which it eventually did acquire.

On February 11, 2008, Development demanded that Medrad make a milestone payment of $200,00 that was due upon Medrad's confirmation of *in vivo* proof of the ability of the

3

product to ablate and aspirate clots without inducing clinically significant vessel damage and clinically significant hemolysis in specified animal models. This was demonstrated at the latest in January 2007. Medrad has refused to make the payment to Development. Instead, on April 14, 2008, Medrad sent notice that it intended to terminate the development agreement. Medrad has also claimed a right to Development's patents and requested that Development and Mische join in a patent application for rights previously controlled and fully covered by Development's patents.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). In ruling on a motion to dismiss, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences in the plaintiff's favor. *Nixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). In order to survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of the claim's basis but must also establish that the requested relief is plausible on its face. *Ashcroft* v. *Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The allegations in the complaint must be "enough to raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 555. Allegations of fraud are subject to the heightened pleading standard of Rule 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This means that the plaintiff must plead the

"who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

## ANALYSIS

### I.     Proper Parties

Medrad first argues that the counterclaims for fraudulent inducement, conversion, and breach of contract fail because counterclaimants are not the proper parties to be bringing these claims.[5] These claims are premised on the development agreement entered into between Medrad and Solutions. As the court has already found and all defendants previously acknowledged, Solutions was never a valid Minnesota limited liability company. While Development, Mische, and Beck may be able to bring claims against Medrad based on the Development Agreement, their standing to do so has not been properly established in the counterclaim. The fraudulent inducement, breach of contract, and conversion claims will thus be dismissed.

### II.    Fraudulent Inducement Claim

Even had counterclaimants properly alleged their standing to bring the fraudulent inducement claim, it would not survive as pleaded. Their fraud claim is based on several alleged misrepresentations, the majority of them being promises of future action embodied in the development agreement. "A cause of action to recover damages for fraud may not be maintained when the only fraud alleged relates to a breach of contact." *Lee* v. *Matarrese*, 793 N.Y.S.2d 457,

---

[5] Counterclaimants attempted to address this argument by filing an amended counterclaim. As this amended counterclaim was not filed in accordance with Federal Rule of Civil Procedure 15(a)(1)(B) or with leave of court, the court struck the amended counterclaim on February 22, 2011. *See* Dkt. No. 76.

457 (N.Y. App. Div. 2005).[6] The alleged misrepresentations memorialized in the development agreement thus are not actionable for fraud.

Counterclaimants maintain, however, that Medrad's representation that it had the experience, resources, and capabilities to develop the products being discussed was not a promise of future action and is the predicate for its fraud claim. The court does not accept that this alleged misrepresentation of Medrad's prior experience and current capabilities allows counterclaimants to pursue the other alleged misrepresentations contained in the contract as part of a fraud claim. It may, however, be sufficient to sustain an independent claim for fraudulent inducement independently, for it appears to be a statement that was collateral to the contract. *See WIT Holding Corp.* v. *Klein*, 724 N.Y.S.2d 66, 68 (N.Y. App. Div. 2001) ("[A] misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action alleging fraud."). Although Medrad asks the court to find that its representations about its experience and capabilities are merely non-actionable puffery, the court is not prepared to do so at this stage. *See Novak* v. *Kasaks*, 216 F.3d 300, 315 ("While statements containing simple economic projections, expressions of optimism, and other puffery are insufficient, defendants may be liable for misrepresentations of existing facts." (citations omitted)). While the pleadings cast doubt as to whether counterclaimants could prevail on their claim, they will be given the opportunity to replead their fraud claim solely based on the misrepresentation contained in ¶ 51(a) of their counterclaim.

### III.   Antitrust Claims

---

[6] New York law applies to the state law claims, as provided in the development agreement. Even were Minnesota or Illinois law to apply, the result would be the same.

Counterclaimants have brought claims for violation of sections 1 and 2 of the Sherman Act. To state a claim under section 1, they must allege that (1) Medrad entered into a contract, combination, or conspiracy; (2) they suffered an accompanying antitrust injury; and (3) the contract, combination, or conspiracy resulted in an unreasonable restraint of trade in the relevant market. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). For their monopolization claim under section 2, counterclaimants must allege that (1) Medrad currently possesses monopoly power in the relevant market, and (2) that Medrad willfully acquired that power. *Endsley* v. *City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000). For their attempted monopolization claim under section 2, they must allege that (1) Medrad had a specific intent to achieve monopoly power, (2) Medrad showed predatory or anticompetitive conduct directed at accomplishing its unlawful purpose, and (3) there is a dangerous probability that Medrad's attempt to monopolize will be successful. *Frantzides* v. *Northshore Univ. HealthSystem Faculty Practice Assocs.*, --- F. Supp. 2d ----, 2011 WL 1231163, at *4 (N.D. Ill. Mar. 30, 2011). For all antitrust claims, counterclaimants must allege that they have suffered an antitrust injury, namely injury resulting from acts that either reduce output or raise prices to consumers. *Wagner* v. *Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 681 (N.D. Ill. 2000). This counterclaimants have not done, as there is no allegation that Medrad's actions reduced the production of thrombectomy devices or caused the price of such devices to increase. Instead, the only injury alleged is the destruction and diminution in value of counterclaimants' patents. How this injury is more than just an injury to a single competitor, something the antitrust laws were not enacted to protect, is not explained. *See Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977) ("The antitrust laws . . . were enacted for 'the

7

protection of competition not competitors.'" (quoting *Brown Shoe Co.* v. *United States*, 370 U.S. 294, 320, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962))); *Goodloe* v. *Nat'l Wholesale Co.*, No. 03 C 7176, 2004 WL 1631728, at *7 (N.D. Ill. July 19, 2004). "Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted." *Wagner*, 121 F. Supp. 2d at 682 (quoting *Elecs. Commc'ns Corp.* v. *Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997)).

## IV. Conversion Claim

To state a claim for conversion under New York law, counterclaimants must allege that (1) the property subject to conversion is a specific identifiable thing, (2) they had ownership, possession, or control over the property before its conversion, and (3) Medrad exercised an unauthorized domain over the property in question to the alteration of its condition or to the exclusion of counterclaimants' rights. *Moses* v. *Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004). A conversion action may not be maintained "where damages are merely being sought for breach of contract." *Id.* (quoting *Peters Griffin Woodward, Inc.* v. *WCSC, Inc.*, 452 N.Y.S.2d 599, 600 (N.Y. App. Div. 1982)). Here, it appears that counterclaimants are seeking to do just that: recover for Medrad's use of the patents as agreed to in the development agreement and the consulting agreements. The development agreement gave Medrad an exclusive license to the patents. If counterclaimants choose to replead this claim, they should make clear how Medrad's actions were anything other than in conformance with these agreements and how they constituted the exercise of unauthorized domain over the patents at issue.

## V. Breach of Contract Claim

Medrad also sought dismissal of the breach of contract claim based on the fact that counterclaimants failed to properly allege the performance of their obligations under the development agreement. The court agrees that this allegation is missing and must be pleaded in order to state a breach of contract claim.

## CONCLUSION AND ORDER

For the foregoing reasons, Medrad's motion [#66] is granted. Counterclaimants have until September 23, 2011 to file an amended counterclaim. This case will be called for a status hearing on September 29, 2011.

Dated: September 6, 2011               Enter: _____

                                              JOAN HUMPHREY LEFKOW
                                              United States District Judge